HAMILTON L. HEYWARD vs. BOSTON AND ALBANY
RAILROAD COMPANY.

Hampden.    September 28, 1897. — November 23, 1897.

Present: ALLEN, HOLMES, KNOWLTON, MORTON, & BARKER, JJ.

*Personal Injuries — Railroad — Negligence — Action.*

A person in charge of a horse which is being transported over a railroad, who is riding, according to custom, in the caboose at the end of a freight train, and who is familiar with the motion of such trains, and who, having been told by a brakeman as the train came to a stop that it had reached the place where he wanted to alight, is injured, while walking near the middle of the caboose towards the door without having hold of anything, by a sudden and unexpected movement of the car throwing him down, cannot maintain an action against the railroad corporation for his injury.

TORT, for personal injuries occasioned to the plaintiff, by the alleged negligence of the defendant, while transporting a horse from Boston to Springfield over the defendant's railroad. The plaintiff's specifications of negligence alleged " that said train was stopped and started in so sudden and violent a manner that the plaintiff was thrown over against a certain seat in the caboose in which he was riding at the time, with great force and violence."

Trial in the Superior Court, before *Dewey*, J., who reported the case for the determination of this court, in substance as follows.

The plaintiff testified that he was seventy years old and lived in Springfield; that in January, 1896, he had occasion to go to Boston to get a horse for one Harris; that he brought the horse to the defendant's yard in Boston and led him into a car; that the horse was put into a house car, and he got into the car with the horse; that the train left Boston at half past eleven o'clock in the forenoon; that when the train was at a standstill about one half or two thirds of the distance between Boston and Worcester, the conductor asked him why he was riding in the car with the horse, and told him that it was too cold to ride there, and to get out and go back and get into the caboose, which he did; that

the caboose had seats on each side, a stove, and a desk; that after he got into the caboose the train started; that he thought the train reached the lower end of the yard at Worcester about five o'clock in the afternoon; that he asked the rear end brakeman how near the despatcher's office they stopped, and he said, "Why, do you want to go in there?" and the plaintiff replied, " Yes "; that the brakeman said, " Sometimes they stop right close to it, and sometimes down this side of it"; that the train stopped, and he got up and started to go out, when the brakeman said, " You don't want to get out here, for we are away to the lower end of the yard, — you sit down, and they will pull us up in a few minutes "; that the train started soon and went a little ways and stopped, and the plaintiff started to get out, when the brakeman said, " Sit still, I will tell you when it is time to get out "; that the plaintiff sat down again, and the train started and went a short distance further and then stopped, and the brakeman said, " Here is where you want to get out "; that the train was then at a standstill, and the plaintiff got up to go out; that he had been sitting on the seat that runs along the side of the car some five or six feet from the rear door; that he had got almost to the door, when there came a sudden jerk, and he was thrown off his feet and over backwards and sideways; and that he struck on the edge of the seat on the opposite side of the car, between the desk and the stove, and fell to the floor, receiving the injuries complained of.

On cross-examination the plaintiff testified that, before the time of his injury, he had accompanied horses on railroads upon a good many occasions; that he had been over the defendant's railroad with horses several times, and had ridden in the caboose before ; that on the occasion of his injury the train made various stops between Boston and Worcester, and at various places cars were taken off and on, and the train stopped and switched; that he noticed a jolt on these occasions; that when the accident occurred he was walking near the middle of the caboose towards the door, without having hold of anything; and that, when he made the contract for the transportation of the horse, he paid six dollars and signed a paper, which was put in evidence and contained the following:

" Boston and Albany Railroad Company.　Uniform Live Stock

Contract. Boston Station, Jan. 4, 1896. This Agreement, made this 4th day of January, 1896, by and between the Boston and Albany Railroad Company, hereinafter called the carrier, and . . . hereinafter called the shipper, Witnesseth : That the said shipper has delivered to the said carrier Live Stock of the kind and number, and consigned and destined by said shipper as follows : One (1) Horse. H. H. Harris, Springfield, Mass. . . .

" That whenever the person or persons accompanying said stock under this contract to take care of the same shall leave the caboose and pass over or along the cars or track of said carrier, or of connecting carriers, they shall do so at their own sole risk of personal injury, from whatever cause, and neither the said carrier, nor its connecting carriers, shall be required to stop or start their trains or caboose cars at or from the depots or platforms, or to furnish lights for the accommodation or safety of the persons accompanying said stock to take care of the same under this contract. . . .

" In consideration of the carriage of the undersigned upon a freight train of the carrier or carriers named in the within contract without charge, other than the sum paid or to be paid for the carriage upon said freight train of the live stock mentioned in said contract, of which live stock I am in charge, the undersigned does hereby voluntarily assume all risk of accidents or damage to his person or property, and does hereby release and discharge the said carrier or carriers from every and all claims, liabilities, and demands of every kind, nature, and description for or on account of any personal injury or damage of any kind sustained by the undersigned so in charge of said stock, whether the same be caused by the negligence of the said carrier or carriers, or any of its or their employees or otherwise." .

At the close of the plaintiff's evidence, the judge, at the request of the defendant, directed the jury to return a verdict for the defendant. If, upon the evidence, the case should have been submitted to the jury, judgment was to be entered for the plaintiff in the sum of $350; if the ruling was correct, the verdict was to stand.

*J. B. Carroll*, (*W. H. McClintock* with him,) for the plaintiff.
*W. H. Brooks*, (*W. Hamilton* with him,) for the defendant.

KNOWLTON, J.   The contract between the plaintiff and the defendant was made upon the assumption that the plaintiff, or some one employed by him, was to go upon the train to take care of the horse, and the price paid for the transportation was paid for the carriage of the attendant as well as for that of the horse. *New York Central Railroad* v. *Lockwood*, 17 Wall. 357. The case differs materially from *Quimby* v. *Boston & Maine Railroad,* 150 Mass. 365, where the plaintiff was being carried gratuitously, and from *Hosmer* v. *Old Colony Railroad*, 156 Mass. 506, where the plaintiff was not in the relation of a passenger, but rather of one who had contracted for the privilege of carrying on a business for his own profit on the defendant's train.

If we assume in favor of the plaintiff that the contract was void as against public policy in that part which purported to exempt the defendant from liability for the negligence of its servants, (see *Doyle* v. *Fitchburg Railroad*, 166 Mass. 492, and *New York Central Railroad* v. *Lockwood*, 17 Wall. 357,) we come to the question whether there was any evidence of negligence on the part of the defendant. The plaintiff by his contract was not to ride upon a train adapted to the carrying of passengers. The writing signed by him contained this provision : "That whenever the person or persons accompanying said stock under this contract to take care of the same shall leave the caboose and pass over or along the cars or track of said carrier, or of connecting carriers, they shall do so at their own sole risk of personal injury, from whatever cause, and neither the said carrier, nor its connecting carriers, shall be required to stop or start their trains or caboose cars at or from the depots or platforms, or to furnish lights for the accommodation or safety of the persons accompanying said stock to take care of the same under this contract." From the nature of the transaction, as well as from the express terms of the writing, the plaintiff well knew that the defendant was to run its train as freight trains usually are run, and that there would be many risks in going upon it to which persons on passenger trains are not exposed. He had often accompanied horses on freight trains, and he knew the usual movements of freight trains at stations, in stopping and starting, and in switching and taking on and leaving off cars.

He knew that there is often quite a jolt, in connection with stopping or starting, to one upon the rear car of a long freight train. He testified that he had experience of frequent stopping and starting on this trip before he reached Worcester. So far as this was reasonably incident to the running of the train, he took the risk of it when he made his contract. The defendant did not undertake to manage its train with unusual care because he was upon it.

We see no evidence that the defendant's servants did anything for which they were culpable. When the plaintiff was about to get off the train a long way east of the station in Worcester, the brakeman very properly told him that that was not the place where he wanted to get off, and when the train had started and stopped again he repeated the warning. Afterwards he told him that they had reached the place where he wanted to alight. In giving him this information, he did not intimate that the train would wait there for the convenience of passengers. The plaintiff had reason to know that the brakeman had not communicated with the engineer or conductor in regard to any special mode of managing the train for the plaintiff's safety or convenience, and that the train was liable to be started in either direction at any moment. There was no negligence on the part of the brakeman in telling the plaintiff that they had reached the place where he wanted to alight, inasmuch as it was fairly implied that the plaintiff was to look out for his own safety in attempting to alight.

Nor is there any evidence of negligence on the part of the engineer or conductor in moving the train at that point, for there is nothing to show that either of them was aware that the movement would be attended with any special risk to the plaintiff. Indeed, the plaintiff, in his specification of the negligence relied on, which is made a part of the pleadings, does not allege any negligence in this particular, but charges as the only negligence relied upon that the train was stopped and started in a sudden and violent manner. To support this allegation there is nothing but his own testimony that he was seventy years of age, and that as he was walking near the middle of the caboose, without having either of his hands upon anything, an unexpected and sudden movement of the car threw him down. In this fact alone

we do not discover any evidence that the movement was different from that which often occurs at the end of a long freight train, without the fault of the engineer or conductor.

We are of opinion 'that there was no evidence of negligence on the part of the defendant.          *Judgment on the verdict.*